UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID LOPEZ, a/k/a "CILINDRO,"<br>a/k/a "VILLANO"<br><br>Defendant. | Criminal No. 15-10338-FDS |

## SENTENCING MEMORANDUM OF THE UNITED STATES

The United States submits this sentencing memorandum to assist the Court in crafting a reasonable and sufficient sentence for David Lopez a/k/a "Cilindro" a/k/a "Villano," a violent member of MS-13 whose relevant conduct included (1) his participation in a brutal attempted murder that—but for luck and some of the finest emergency services in the world—would have resulted in the death of the victim; and (2) his participation in the conspiracy to kill CW-2 that—but for law enforcement's efforts to immediately extract CW-2 from his home and subsequently place him in the Witness Protection Program—would have resulted in the death of the victim.

For the reasons below, the government requests that the Court impose a sentence of ***240 months in custody*** to be followed by 3 years of supervised release. Anything less would be insufficient to comply with the purposes of 18 U.S.C. § 3553(a). This memorandum first discusses why a 240-month sentence is appropriate regardless of the final guideline range, and then comments briefly on why 240-months is a guideline sentence regardless of how the Court calculates the range.

**I.     A 240-Month Sentence is Appropriate and Necessary Given the Defendant's Offense Conduct and the 18 U.S.C. § 3553(a) Factors.**

Lopez is a member of MS-13, arguably the most violent and dangerous criminal organization operating in the United States today. Lopez did more than just join MS-13—he was personally involved in advancing the two goals of MS-13 that are most responsible for the widespread violence associated with the gang: efforts to kill suspected MS-13 rivals and efforts to kill suspected MS-13 cooperators.

As a reward for his violence, MS-13 promoted Lopez to "homeboy" for his May 2014 attempted murder, even though the victim survived, because Lopez arguably did everything he possibly could have to ensure the victim's death. Lopez then became the de-facto leader of the Enfermos clique out on the streets once Rafael Leoner Aguirre was arrested because Lopez was the only other homeboy in the Enfermos clique.

Each of the 3553(a) factors argue strongly in favor of the government's recommended sentence. If not for the statutory maximum of 240 months, it is likely that the government would be asking an even higher sentence.

**A.     The Nature and Circumstances of the Offense.**

The nature and circumstances of the defendant's offense contain numerous aggravating factors and involve no mitigation. Short of death—a result the defendant did his best to achieve—it is hard to imagine a more troubling set of circumstances than the offense conduct involving the defendant. He tried his best to kill a suspected gang rival and tried his best to kill a gang member suspected of cooperating, and in each instance, attempted to do so in the most chilling and gruesome of ways.

*A Heartbeat Away from Death*

On May 29, 2014, David Lopez did everything in his power to commit murder. After his fellow MS-13 member Daniel Menjivar a/k/a "Roca" stabbed a suspected gang rival approximately 21 times in a brutal attempt to kill the victim, Lopez ran up and emptied the clip of his gun into the victim's chest, doing his best to finish the job and ensure the victim's death.  The heinous actions of the two attackers can be summarized in their own words:

> MENJIVAR: Fuck, I stabbed him 21 times, dude!
>
> CW-1: How many?
>
> MENJIVAR: 21!  His intestines were dangling like this, look.
>
> CW-1: No fucking way, man!  With what knife did you cut him, then, that didn't…?
>
> MENJIVAR: One of those butcher knives, something like this, about ten inches…
>
> CW-1: And you didn't send him to the other side? Why didn't you stab him in the chest?
>
> MENJIVAR: No, man.  I was stabbing him here, here where one kills for sure.
>
> MENJIVAR: That's where I was stabbing him! He was on the ground there when the other guy came and shot him several times in the chest.
>
> CW-1: Who shot him?
>
> MENJIVAR: VILLANO [LOPEZ].

PSR, ¶ 41 (summarizing April 21, 2015 recording).

> LOPEZ: That garbage wasn't firing anymore. Uh, I went bang, bang, bang at him.
>
> CW-1: Wow . . .

| | |
|---|---|
| LOPEZ: | Bang, bang and the son of a bitch was opening his eyes like this. He was opening his eyes when I was shooting him, fuck, and--and the gun was not firing anymore. |
| CW-1: | And how many rounds did that shit have? |
| LOPEZ: | All of them, it was full; six. |
| CW-1: | And you shot all six of them at him? |
| LOPEZ: | Exactly. I was (UI) that shit and nothing. |
| CW-1: | So, how many actually hit him? |
| LOPEZ: | I had already shot him about four times. (UI) |

PSR, ¶ 43 (summarizing April 27, 2015 recording).

At the trial of Rafael Leoner Aguirre a/k/a Tremendo in November 2017, the Court heard testimony from Star Chung, the Chelsea Police Officer who was the first responder to the scene. Her testimony made clear that the descriptions by Lopez and Menjivar of what they did to the victim were not hyperbole, but horrifically accurate statements of the condition in which they left the victim to die:

| | |
|---|---|
| Q. | When you lifted his shirt, did you make any observations of the nature of the injuries? |
| A. | Yes, sir, he was eviscerated, there was his internal intestines protruding. |
| Q. | When you mentioned that you took steps to put pressure on the wound, how did you do that? |
| A. | I removed my jacket sleeve, and I attempted to wrap it around his stomach. I pushed his intestines back into his stomach and applied pressure to stop the bleeding. |

Nov. 13, 2017 Trial Tr. at pp. 64-65.

The Court also heard testimony from Dr. Peter Fagenholz, the trauma surgeon from Massachusetts General Hospital who attended to the victim after he was rushed to MGH for emergency surgery:

> A. I was called to see the patient as what's called a trauma stat, which is immediate activation of a surgeon to the emergency department, and when I came to see him, he suffered multiple penetrating injuries to the chest and the abdomen. We placed tubes into both chest cavities to try to drain blood and re-expand his lungs. Immediately after that he had a cardiac arrest in the emergency department.
>
> …
>
> Q. Now, Doctor, when you say a cardiac arrest, would you explain the circumstances of what you mean by that, what occurred?
>
> A. Yeah, it means that he had no obtainable blood pressure, that there was no blood circulating through his body, and in this case it appeared to be because he had lost all of his blood. He had bled out.
>
> Q. When the patient went into cardiac arrest, what procedures did you and your staff undertake to address the cardiac arrest?
>
> A. I opened his chest in the emergency department and put a clamp on his aorta, which is the main artery that feeds blood to the body, and then we transfused blood and with the blood transfusion and the aortic clamp, he regained blood pressure.

Nov. 14, 2017 Trial Tr. at pp. 6-7.

The victim had, quite literally, bled out and lost cardiac function as he fought for his life in the emergency room at MGH. The doctor then described some of the injuries he observed once surgeons were able to get the victim's blood flowing again:

> A. He had multiple injuries to both lungs, which were bleeding, and he had an injury to one of the arteries that feed the large intestine in the abdomen, which was another

5

> major source of blood loss, and then he had other serious injuries that were not immediate sources of major blood loss, including injuries to the large intestine itself, two injuries to the small intestine and an injury to the diaphragm.

*Id.* at pp. 9-10.

Notably, the trauma surgeon testified about the victim's injuries—two and a half years after the first and only time he treated the patient—without having to refer to the victim's medical records that the government had introduced as evidence:

> Q.   Doctor, I notice you're not referring to the medical records. Do you have an independent memory of this patient?
>
> A.   I do.
>
> Q.   Why is it that you have an independent memory of this patient?
>
> A.   Because it's unusual for patients to survive this severity of injury, to survive a cardiac arrest in the emergency department. So when that happens, that's memorable.

*Id.* at pp. 11-12.   Simply put, if not for luck and a medical miracle, Lopez would be facing life in prison for first-degree murder.

**B.   The History and Characteristics of the Defendant.**

Whatever insight the Court can glean into the defendant's history and characteristics only provides additional reasons to sentence him to 240-months.

### *The Mind of a Murderer*

Menjivar's statements about the attempted murder confirm what is troublingly obvious from the evidence of the attack: "this dude, Villano [Lopez], always has the mind of a murderer."  PSR, ¶ 42 (summarizing April 21, 2015

6

recording). Notwithstanding the fact that the victim "was already on the ground, all sliced up," Lopez was not content to just let the victim bleed to death if he could also personally ensure that he murdered someone. *See* PSR, ¶ 42. Lopez rushed over to make sure he finished the job by shooting the victim in the chest multiple times. *Id. See also* April 21, 2015 recording ("[Lopez] had already been told that the [victim] was finished, that [the victim] was finished, and [Lopez] came rushing…" and "By the time [Lopez] got off at the next stop over to where I was, the guy was already on the ground, all sliced up, I already had him there" and "[Lopez] arrives and sees the son of a bitch on the ground, and he shoots him right there. That's how it happened.")

CW-2 testified about the same based on Lopez's own admissions to CW-2. *See* PSR, ¶ 46 (quoting trial testimony where CW-2 recounted the attack by saying "when [the victim] was on the floor from so many stabbings, Villano [Lopez] shot him").

The stabbing by Menjivar was horrific and gruesome, but in many ways, the callous and depraved manner in which Menjivar rushed over to shoot a man who was already bleeding to death provides an even more troubling insight into the mind of a murderer.

This same mindset can be seen in how Lopez discusses various potential ways to kill CW-2 in April 2015. For example, "at one point, Lopez suggested using a wire to garrote to strangle CW-2 to death." PSR, ¶ 59.

LOPEZ: That, too. But I don't think so. It's better with the wire because with the wire—

BARILLAS: It's better because he can't escape from it.

LOPEZ: You grab him all at once and you do this here, like this, butterfly style, you see?

7

>BARILLAS: Uh-huh.
>
>LOPEZ: And that thing won't, won't get loose again.
>
>BARILLAS: He won't be able even UI anymore.
>
>LOPEZ: And you can even let go of the wire and the son of a bitch is not going to get up. He's going to be stuck there, trying to get the wire off.

*Id*. While LOPEZ is saying this, he is captured on video demonstrating with his hands how to kill someone in this manner. PSR, ¶ 60.

In another instance, LOPEZ is captured on video discussing cutting CW-2's jugular with a knife, comparing how to kill CW-2 with how to kill a hen:

>LOPEZ: You just cut the jugular with the knife there, nice and easy, just like with a hen when you search under the feathers so that you feel the pulse, like that, you feel the son of a bitch like that until you feel the vein and that's where you jab the knife in. And with just a little—a little bit like that, [whistles], it goes in.

PSR, ¶ 60.

### *How to Get Away With Murder*

Lopez's statements on the recordings are also extremely troubling because they suggest that Lopez has previously committed murder(s). *See* PSR, ¶¶ 56-61. The April 27, 2015 recording, for example, contains significant discussion about not only ways to kill CW-2, but ways to get away with murder. As part of that discussion, Lopez discusses what steps to take if they are going to commit the murder by using a gun (as opposed to using machetes or knives or wires, as discussed above):

>LOPEZ: *I'm not going to do that thing the way I'm dressed right now, dude.* Chapin will have to lend me some of those crazy things you have, dude, which are double my size.

8

> BARILLAS: Yeah.
>
> LOPEZ: One of those, dude. *And I'm also going to get me a hat; you'll see.*
>
> CW-1: A different baseball cap. I have some baseball caps there.
>
> LOPEZ: Ah, a different baseball cap, like that, right, because gun powder sticks on the clothes. *The clothes has to disappear, you pee on your hands--*
>
> …
>
> BARILLAS: That stuff will stick around here.
>
> LOPEZ: It even sticks on the fingers.
>
> BARILLAS: Yeah.
>
> LOPEZ: No, but let's say someone UI, it covers you dude. Depending on how the wind is, it covers you, it covers your body, your body; your clothes, all get covered in gun powder. Then you put your hands, and you have to pee on them. *It's a secret I figured out in Salvador. When we were going to kill we would pee all over our hands* UI, fuck.

PSR, ¶ 58; April 27, 2015 Recording (emphasis added).

### III. Need for Sentence to Afford Adequate Deterrence, Reflect Seriousness of the Offense, and Promote Respect for the Law.

The remaining 18 U.S.C. § 3553(a) factors also strongly favor the imposition of a 240-month guideline sentence.

As for deterrence, evidence suggests that the only thing MS-13 members appear to fear is going to prison in the United States. In this case alone, multiple defendants have been caught on tape stating that they do not fear deportation because they believe that the gang will either protect them in El Salvador or help them get back into the United States. Conversely, the defendant—who was caught

9

on tape suggesting that he does not even fear death—was caught admitting that he fears the law and significant jail sentences.

| | | |
|---|---|---|
| CW-1: | | That's the bad part; the young guys get all nervous. |
| LOPEZ: | | ***The only thing that I fear here is the law, dude.*** I feel that those sons of bitches here turn you into shit; they don't beat you as they do in Salvador but… |
| CW-1: | | But they do it psychologically. |
| LOPEZ: | | I feel fucked here since this is not our country, dude, and we don't want to go back to Salvador. So, we are here to stay, we stay here for a while, but what the fuck, what the hell are we going to do here? That's how I feel, dude. UI. |

April 28, 2015 Recording (emphasis added). The violence committed by the defendant must be deterred as an abstract matter, but here, the Court has specific evidence that significant jail sentences may serve as an actual deterrent to violent gang members who may not fear much else.

Further, the evidence makes clear that if this violence is not deterred in the strongest of terms, and if respect for the law is not promoted in the clearest of terms, this violence can snowball, just like it unfortunately has in countries like El Salvador where, for various reasons, the criminal justice system is struggling to promote respect for the law and deter violent crime.

| | | |
|---|---|---|
| CW-1: | | In the last two months, Chelsea has gotten hot. |
| VILLANO: | | Really hot! Fucking, fucking hot! There are like four guns! But TREMENDO lost one, and he was arrested. Then we lost another one that belonged to the Everetts. Very quickly. I would tell the dude, "Doggie, let's chill right now. Things are hot," I would tell him. "Yes, you'll see, soon," he told me. That's what happened in the neighborhood there |

> in El Salvador. ***When I went to hang out with the clique, there were only a few homeboys. In the course of a year, dude, there were about 40 homies, dude. Homies that had committed two killings so that they could get jumped in, and about 60 chequeos. Fuck, all at once!***

April 28, 2015 Recording (emphasis added).  In this case, the Court heard evidence about how Leoner-Aguirre's arrival in Chelsea unleashed significant violence and in the course of just one year, Leoner-Aguirre [Tremendo], Hector Ramires [Cuervo], Brayan Galicia Barillas [Chucky], Daniel Menjivar [Roca], Domingo Tizol [Chapin], and Angel Pineda [Bravo] all engaged in murder or attempted murder on behalf of just one clique of MS-13 operating in just one city in Massachusetts.

Finally, the government notes that there is *typically* a discount given to defendants who plead guilty, and the Court and the government *typically* want to encourage guilty pleas.[1]  The government considered whether to recommend 235 months instead of 240 months for that reason.  However, upon careful reflection, in this case, the government believes that competing policy considerations and societal

---

[1]    As the Court is aware, in this case, the government has generally recommended—and the Court has generally granted—discounts to defendants who pled early (often via downward variances).  In this individualized case, however, a downward variance is not warranted.  Further, the government notes that the defendant pleaded guilty on the Friday before juror questionnaires were submitted and *after* the time the government made clear that it would no longer offer a three-level reduction for early acceptance.  The government would be well within its rights to not move for a three-level reduction, and indeed, that is what the government told the defendant it would do at the time of sentencing.  However, given the fact that the 240-month sentence that the government is recommending is within the Guideline Range even if a three-level reduction is granted, the government does not wish to quibble about the Guideline Range and the government will instead move for the three-level reduction and base its argument on § 3553(a) factors.

interests significantly outweigh any potential benefit from the Court using this case as another example to encourage pleas. The government and the defense bar (and the public) are all well aware of the benefits of pleading early, and the Court has correctly recognized the importance of encouraging pleas in other sentencings. As to this defendant, however, the government believes that it is far more important to focus *not* on whether a 240-month sentence might discourage pleas, but whether a 240-month sentence might discourage the violence and mayhem unleashed by the defendant and his fellow MS-13 members.

Given the defendant's guideline range, and more importantly, given the defendant's offense conduct, the nature and circumstances of his actions, the history and characteristics of the defendant, the need to afford adequate deterrence, and the need to promote respect for the law, a 240-month sentence is appropriate and not greater than necessary to further the purposes of § 3553(a).

### IV.     The Defendant's Guideline Range Should Be 240 Months.

The government objects to one aspect of the Guideline Range calculation in the PSR and the Court will need to determine how best to account for the defendant's leadership role in calculating his offense conduct and Guideline Range. The PSR calculates the Guideline Range as 210 to 240 months based on a total offense level of 37. *See* PSR, ¶¶73-92; 122. The government's recommended sentence is within the PSR's Guideline Range. As a purely legal matter, however, the government believes that the defendant's Guideline Range should be 240 months, and it would be error for the Court to conclude otherwise.

### *Role Enhancements in RICO Cases*

As a *factual* matter, Probation agrees with the government that the defendant should receive a 3-level adjustment for role in the offense. *See* PSR, ¶ 82. As a purely *legal* matter, however, the government and Probation disagree on how to apply the adjustment for role in the offense.

The PSR applies this three-level adjustment for Group 2 (Conspiracy to kill CW-2) because the defendant was the "street leader" of the Enfermos clique and a "manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." *Id.* The PSR *does not* apply this three-level adjustment for Group 1 (Attempted Murder).

In the draft PSR, Probation applied this 3-level adjustment to both groups. The government believes that was (and is) the correct way to proceed. In the final PSR, Probation *did not* apply the 3-level adjustment to Group One because it is now Probation's position that the role in offense adjustment should apply to each underlying racketeering act, as opposed to the overall racketeering conspiracy. *See* PSR, p. 41. Probation indicates that it conferred with the Sentencing Commission's Office of Education and Practices in formulating that opinion. Respectfully, the government disagrees and believes that the plain terms of the Guidelines Manual and case law suggest otherwise—the defendant should be given a role adjustment for his role in the overall RICO conspiracy.

Application Note 1 to USSG § 2E1.1 states that "where there is more than one underlying offense, treat each underlying offense as if contained in a separate count

of conviction for the purposes of subsection (a)(2). To determine whether subsection (a)(1) or (a)(2) results in the greater offense level, *apply Chapter Three, Parts A, B, C, and D to both (a)(1) and (a)(2).*" (Emphasis added.) The role enhancement is a "Chapter Three" enhancement, and thus, the government believes it should be applied to each underlying group or offense.

Admittedly, the language in the application note is unclear and open to interpretation. Courts have grappled with how best to deal with this enhancement in RICO cases. The government is not aware of First Circuit law on this point, but available law from other Circuits strongly supports a leadership enhancement in such cases. *See, e.g.*, *United States v. Ivezaj*, 568 F.3d 88 (2d Cir. 2009); *United States v. Damico*, 99 F.3d 1431 (7th Cir. 1996).

*Ivezay* is especially instructive. In that case, the Second Circuit found that the District Court had properly applied a leadership enhancement to a RICO defendant who was a leader but claimed that he should not have been given an enhancement based on the underlying predicate acts—the exact situation presented here:

> Finally, Ivezaj challenges his sentence on the ground that any aggravating role enhancement the district court applied should have been based on the conduct alleged in the underlying predicate acts, rather than on his role in the RICO enterprise as a whole. We typically review a district court's factual findings in support of a role enhancement for clear error. However, because Ivezaj's challenge requires us to make a legal determination about the applicability of the enhancement, we review the district court's determination de novo.
>
> U.S.S.G. § 2E1.1 addresses the base offense levels for RICO offenses, requiring a base offense level of 19 or the offense level applicable to the underlying racketeering activity. Application Note 1 to the Guideline provides that:

> Where there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction for the purposes of subsection (a)(2). To determine whether subsection (a)(1) or (a)(2) results in the greater offense level, apply Chapter Three, Parts A, B, C, and D to both (a)(1) and (a)(2). Use whichever subsection results in the greater offense level.

> U.S.S.G. § 2E1.1, cmt. n. 1. Because the Application Note treats each predicate act as "if [it were] contained in a separate count of conviction" for purposes of determining the offense level for the alleged racketeering activity, Ivezaj argues that the district court failed to consider his role in each charged act when applying the role enhancement.

> *We agree with the district court that a defendant's role adjustment is to be made on the basis of the defendant's role in the overall RICO enterprise.*

*Ivezaj*, 568 F.3d at 99–100 (emphasis added) (citations omitted); *see also Damico*, 99 F.3d at 1437 (finding same and concluding that "[The Application Note] only requires the underlying offenses to be treated separately "for the purposes of subsection (a)(2)"—that is, only for the purpose of establishing the base offense level applicable to the RICO conspiracy.  The note does not say that the separate treatment extends as well to application of the Chapter Three adjustments.").

The Second Circuit then goes on to discuss the strong policy and common-sense reasons to apply the Guidelines in this manner:

> *[A]nalyzing a defendant's role in the overall RICO enterprise makes a good deal more sense than considering his role in each underlying predicate.*  In the case of a § 3B1.1(b) role enhancement, it makes little sense to allow a defendant who acts in a leadership capacity in a wide-ranging criminal enterprise to have his offense level adjusted on the basis of his participation in discrete racketeering acts.  For example, *a defendant who served as a leader or manager of an extensive RICO enterprise should not be able to avoid a role enhancement simply because certain predicate acts involved fewer than five participants or criminal activity that was not extensive.*  Second, we agree that the language of

15

the Guidelines is clear that the requirement to look at each individual act in a RICO offense is only for the purpose of establishing the base level offense, not for applying the Chapter Three adjustments.

*Ivezaj*, 568 F.3d at 99–100 (emphasis added).

Based on the reasoning of these cases, the government requests that the defendant should get a role enhancement for both Group 1 and Group 2 given his overall role in the conspiracy.

### *Correct Calculation of Guideline Range*

The calculation in the PSR should be modified as follows: The three-level adjustment for role in the offense, which was already applied for Group Two, *see* PSR, ¶ 82, should also be applied for Group One. That would result in the following changes:

- A three-level increase in Group One, resulting in an adjusted offense level of 40 for Group One. *See* PSR, ¶ 78.

- The greater of the adjusted offense levels would thus be 40, instead of 38. *See* PSR, ¶ 86.

- Under the grouping rules, and same as before, there would be an increase of 2 level based on the two groupings, resulting in a new combined offense level of 42. *See* PSR, ¶ 87.

- After acceptance, the new total offense level would be 39, instead of 37. *See* PSR, ¶ 92.

Given the defendant's Criminal History Category of I, the typical range for offense level 39 would be 262-327 months. However, given the statutory maximum of 240 months, the defendant's Guideline Range should be 240 months. There is no change to the range for supervised release.

## V. Conclusion

For the reasons above, the Court should sentence the defendant to his Guideline Range of ***240 months in custody***, to be followed by 3 years of supervised release. In the event that the Court declines to adopt the government's reasoning and declines to apply the role enhancement, the defendant's guideline range would be 210 to 240 months, in which case, a sentence of ***240 months in custody*** is still appropriate and warranted.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: /s/ Kunal Pasricha
Kunal Pasricha
Glenn A. MacKinlay
Christopher Pohl
Kelly B. Lawrence
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I, the undersigned, certify that the foregoing document was filed through the Electronic Court Filing (ECF) system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

/s/ Kunal Pasricha
KUNAL PASRICHA
Assistant United States Attorney