# United States Court of Appeals
## For the First Circuit

No. 18-1418

UNITED STATES OF AMERICA,

Appellee,

v.

DAVID LÓPEZ,
a/k/a CILINDRO, a/k/a VILLANO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Selya, Circuit Judges.

Michael M. Brownlee and The Brownlee Law Firm, P.A., on brief for appellant.
Andrew E. Lelling, United States Attorney, and Randall E. Kromm, Assistant United States Attorney, on brief for appellee.

April 30, 2020

**SELYA**, **Circuit Judge**. The backdrop for this sentencing appeal is the government's relentless pursuit of a notorious criminal gang, famously known as MS-13. The appeal itself requires us to answer a question of first impression in this circuit: when a defendant is convicted of racketeering conspiracy under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d), does the imposition of a role-in-the-offense enhancement, see USSG §3B1.1, depend upon the defendant's role in the racketeering enterprise as a whole or, instead, upon his role in the discrete acts of racketeering activity that underpin the RICO conviction? We conclude that such an enhancement is dependent upon the defendant's role in the criminal enterprise as a whole. We further conclude that the court below supportably found that defendant-appellant David López occupied a managerial or supervisory role in the racketeering enterprise involved here. Accordingly, we affirm the challenged sentence.

## I. BACKGROUND

"Because this appeal follows a guilty plea, we draw the facts from . . . the change-of-plea colloquy, the unchallenged portions of the presentence investigation report (PSI Report), and the transcript of the disposition hearing." United States v. Ocasio-Cancel, 727 F.3d 85, 88 (1st Cir. 2013). The MS-13 street gang is a Salvadorian-based, transnational criminal enterprise with a pervasive foothold in the United States, where it operates

- 2 -

a myriad of subgroups, called "cliques," in no fewer than forty-six states. MS-13 cliques hold meetings at which, among other things, they collect dues, plan criminal exploits, and hash out membership issues. Each clique typically has two chieftains: a "First Word," who is responsible for organizing and directing the clique, and a "Second Word," who serves as the First Word's alter ego and assumes those duties in the First Word's absence.

There is also what amounts to a caste system within each clique. Members, known as "homeboys," are on the upper rungs of the hierarchy. According to the government, an aspirant usually must "participate in the killing of a rival gang member or suspected informant" to achieve that status. Prospective members, called "paros," are allowed to "hang around" with members. Paros who are deemed to be adequately trustworthy are promoted to "chequeos," a status that affords them increased access to members.

In 2013 and 2014, several young chequeos and paros, including the appellant, began forming a new MS-13 clique in Chelsea, Massachusetts. This group, though, was without a leader. In the spring of 2014, centralized MS-13 command staff sent Rafael Leoner-Aguirre (Leoner), a homeboy, from Michigan to Massachusetts to organize the fledgling Chelsea group into a sanctioned clique. The appellant proved to be an active and trustworthy disciple, and he was promoted to chequeo as the clique evolved under Leoner's direction.

- 3 -

In April of 2014, federal authorities arrested Leoner and charged him with attacking members of a rival gang. See United States v. Leoner-Aguirre, 939 F.3d 310, 313-14 (1st Cir. 2019), cert. denied, 140 S. Ct. 820 (2020). Notwithstanding his immurement, the Chelsea clique continued to regard Leoner as its First Word. Meanwhile, the appellant took over as the de facto leader of the clique on the streets, directing the clique's illicit activities with Leoner's oversight.

On May 29, 2014, the appellant and a fellow clique member, Daniel Menjivar, attacked a member of a rival gang, Denys Perdomo Rodriguez (Perdomo), at a bus stop in Chelsea. Menjivar initiated the attack, stabbing Perdomo repeatedly. As Perdomo lay bleeding on the ground, the appellant shot him several times. Although grievously wounded, Perdomo survived.

Menjivar was subsequently arrested for his role in the Perdomo affair. Upon learning of Menjivar's arrest, the appellant fled to New Jersey. Once there, he was promoted to homeboy for his part in the assault on Perdomo.

We fast-forward to April of 2015. Around that time, the authorities learned that the Chelsea clique was planning to kill one of its own members, CW-2, premised on the mistaken belief that he was then a police informant. The investigators also learned of the clique's efforts to bring the appellant back from New Jersey to carry out the murder. In seeming confirmation of this

- 4 -

intelligence, investigators spotted the appellant seated in a car near CW-2's home on April 27.  He was accompanied by another clique member and a government cooperator (CW-1).  In a conversation recorded at that time, the appellant indicated that the clique had the "go ahead" to kill CW-2 and proposed alternative methods for carrying out the slaying (such as cutting his throat or strangling him with a wire).

On April 28, CW-2 — who by then had begun cooperating with the government — testified before a federal grand jury as part of its probe into MS-13.  That same day, ongoing surveillance recorded a conversation between the appellant and another clique member, memorializing their attempts to find and murder CW-2.

In due course, the grand jury handed up a nineteen-count fifth superseding indictment charging sixty-one MS-13 associates (including the appellant) with a golconda of racketeering activities, firearms and drug offenses, and sundry other crimes. Pertinently, the grand jury charged the appellant with conspiracy to conduct enterprise affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).  The indictment listed a number of specific racketeering acts undergirding the broader conspiracy.  With respect to the appellant, the specified acts were the attack on Perdomo and the planned execution of CW-2.

Although he initially maintained his innocence, the appellant changed his plea to the sole count against him shortly before his scheduled trial. The district court accepted his guilty plea. The court then ordered the preparation of a PSI Report which, when received, led to a wrangle over a recommended three-level role-in-the-offense enhancement under USSG §3B1.1(b).

The appellant objected to the PSI Report's application of the role enhancement and, relatedly, to its calculation of the guideline sentencing range (GSR). He asserted that the government had not established that he was a manager or supervisor with respect to the assault on Perdomo because he was only a chequeo, not a homeboy, when that assault occurred. Therefore, the PSI Report had artificially inflated both his total offense level and GSR.

In its sentencing memorandum, the government agreed with the probation officer's conclusion that a three-level enhancement for the appellant's role in the offense was warranted. It disagreed, though, with the probation officer's methodology for arriving at the enhancement. The probation officer had analyzed the appellant's role in each of the predicate racketeering acts separately and concluded that the enhancement only applied to the plot to murder CW-2. The government countered that the role enhancement should apply across the board based on the appellant's managerial role in the overall conspiracy.

At the disposition hearing, the court acknowledged the appellant's objection to the conclusion that he "was a manager or supervisor." The court proceeded to overrule this objection because the unchallenged portions of the PSI Report adumbrated facts sufficient to support a finding that the appellant had acted as a manager or supervisor of the clique as a whole. The court also acknowledged that the government had raised a "subsidiary issue" concerning how the relevant guideline provision should be construed and applied. Even so, the court was content to say that the appellant was a manager or supervisor of the enterprise as a whole and, thus, it effectively adopted the government's interpretation of the relevant guideline. The appellant objected, noting that if his interpretation of the relevant guideline were to be employed, both the offense level and the corresponding GSR would be reduced.

After hearing arguments of counsel and the appellant's allocution, the court imposed the statutory maximum sentence of 240 months. See 18 U.S.C. § 1963(a). This timely appeal followed.

**II. ANALYSIS**

"Appellate review of a criminal defendant's claims of sentencing error involves a two-step pavane." United States v. Miranda-Díaz, 942 F.3d 33, 39 (1st Cir. 2019). Under this framework, we first examine any claims of procedural error. See United States v. Matos-de-Jesús, 856 F.3d 174, 177 (1st Cir. 2017).

- 7 -

When examining such claims, we evaluate the district court's interpretation and application of the sentencing guidelines de novo.  See United States v. Ruiz-Huertas, 792 F.3d 223, 226 (1st Cir. 2015).  "If the sentence passes procedural muster, we then address any challenge to its substantive reasonableness."  Matos-de-Jesús, 856 F.3d at 177.  Here, however, the appellant does not challenge the substantive reasonableness of his sentence.

With this framework in mind, we tackle the appellant's contention that his sentence was procedurally unreasonable because the district court misinterpreted the sentencing guidelines when calculating his total offense level.  His principal claim of error, which engenders de novo review, poses a question of first impression in this circuit:  when a defendant is convicted of racketeering conspiracy under RICO, does the imposition of a role-in-the-offense enhancement depend upon the defendant's role in the racketeering enterprise as a whole or, instead, upon his role in the discrete acts of racketeering activity that underpin the RICO conviction?  Answering this question requires us to explore the interplay between USSG §2E1.1 and USSG §3B1.1.

Section 2E1.1 provides a roadmap for calculating the offense level applicable to an offender convicted of RICO conspiracy.  Specifically, it states that a defendant's base offense level should be the greater of nineteen or "the offense level applicable to the underlying racketeering activity."  USSG

§2E1.1. This offense level may be adjusted upward if the defendant qualifies for one or more of various sentencing enhancements. See USSG §2E1.1 cmt. n.1.

In the case at hand, the district court determined that the appellant qualified for a role-in-the-offense enhancement under section 3B1.1(b), which provides for a three-level upward adjustment "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." There is an open question, though, as to how the foundation for the enhancement should be laid. Application Note 1, appended to section 2E1.1, furnishes some direction for resolving this quandary. That note states:

> Where there is more than one underlying offense, treat each underlying offense as if contained in a separate count of conviction for the purposes of subsection (a)(2). To determine whether subsection (a)(1) or (a)(2) results in the greater offense level, apply Chapter Three, Parts A, B, C, and D to both (a)(1) and (a)(2). Use whichever subsection results in the greater offense level.

USSG §2E1.1 cmt. n.1.

Relying on this language and advice from the Sentencing Commission's Office of Education and Practices (OEP), the probation officer examined the predicate acts underpinning the RICO conspiracy conviction (the attack on Perdomo and the planned attack on CW-2) independently to determine the applicability of

- 9 -

the putative role-in-the-offense enhancement. The district court was not so sanguine, observing that such an approach would lead to anomalous results: it "would actually put a person in a better position if [he was] a leader of a racketeering conspiracy but didn't personally participate in the individual acts or each of those acts involved five or fewer people." Thus, the court expressed its general agreement with the approach adopted by the Second and Seventh Circuits — an approach that assays a defendant's role in the overarching conspiracy to determine the applicability of any role-in-the-offense enhancement. See United States v. Ivezaj, 568 F.3d 88, 99-100 (2d Cir. 2009); United States v. Damico, 99 F.3d 1431, 1437-38 (7th Cir. 1996).

Although the court suggested that it would not definitively decide which interpretive approach was correct, it used the approach employed by the Second and Seventh Circuits to calculate the appellant's GSR. It found that the appellant was a manager or supervisor of the criminal enterprise as a whole and applied the three-level enhancement solely on that basis. According to the appellant, the district court's suggestion that it did not have to resolve this dispute about the proper interpretation of section 2E1.1 was procedural error because the two approaches resulted in different GSRs. Since the district court effectively adopted the government's interpretation of the relevant guideline and effectively rejected the appellant's

interpretation, the claim of procedural error is properly before us.

In this court, as below, the appellant urges us to adopt the interpretive modality fashioned by the probation officer. He submits that the plain language of Application Note 1 mandates that a role-in-the-offense enhancement must be calibrated according to a RICO defendant's role in the particular predicate acts underlying the charged conspiracy. The fact that the OEP endorsed this methodology, the appellant says, is a compelling indication that this is the better approach.

The government demurs, relying heavily on the Seventh Circuit's decision in Damico. There, Damico — having been convicted of RICO conspiracy — assigned error to the district court's application of a four-level enhancement under USSG §3B1.1(a) based upon his role in the RICO enterprise as a whole. See Damico, 99 F.3d at 1435. Much like the appellant, Damico pinned his hopes on Application Note 1. See id. at 1435-36. The Seventh Circuit rejected Damico's argument, noting that it failed to "account for the fact that section 2E1.1's sole purpose is to establish the base offense level for a RICO offense, not the adjusted offense level." Id. at 1437 (emphasis in original). Consequently, the court interpreted Application Note 1 as requiring that the underlying offenses be treated separately only for the purpose of determining the base offense level applicable

- 11 -

to the overarching RICO conspiracy. See id. In a nutshell, the court held "that the predicate-by-predicate approach of Application Note 1 applies . . . only for the purpose of establishing a RICO defendant's base offense level, and not for the purpose of applying the Chapter Three adjustments." Id. at 1438.

We find the reasoning in Damico persuasive. The weight of the appellant's attempt to walk a tightrope between the RICO conspiracy conviction itself and the underlying predicate acts is more than Application Note 1 can bear. Recognizing as much, other circuits have declined defendants' invitations to place their imprimatur on such an exercise in funambulism. Indeed, every court of appeals that has spoken to the issue has followed Damico's lead.[1] See Ivezaj, 568 F.3d at 99-100; United States v. Yeager, 210 F.3d 1315, 1317 (11th Cir. 2000) (per curiam); United States v. Coon, 187 F.3d 888, 899 (8th Cir. 1999).

A salient reason for this unanimity is that the Damico approach fits seamlessly with an important policy concern undergirding the RICO statute. When Congress enacted RICO in 1970,

---

[1] The OEP guidance to which the appellant adverts is not a significant counterweight to this unbroken chain of authority. The OEP guidance is merely advisory and not binding upon the courts. Cf. United States v. Carrozza, 4 F.3d 70, 78 n.6 (1st Cir. 1993) (explaining that instructions published by Sentencing Commission in informational booklet are not meant to bind the courts or the parties in any given case).

it was particularly concerned with bringing to justice leaders of organized crime syndicates (such as the Mafia and La Cosa Nostra), who were often able to avoid prosecution and "flout the best efforts of . . . law enforcement and judicial authorities" by hiding behind underlings. 116 Cong. Rec. 970 (1970). In light of this policy, it seems right as rain to conclude that a defendant's role in the overarching conspiracy, rather than his role in discrete predicate acts, constitutes the critical benchmark for determining whether a role-in-the-offense enhancement is warranted under section 3B1.1.

To seal the deal, the text of Application Note 1 directs courts to apply Chapter 3 adjustments — including enhancements for a defendant's role in the offense — "to both (a)(1) and (a)(2)." USSG §2E1.1 cmt. n.1 (emphasis supplied). Subsection (a)(1), though, does not require an examination of the defendant's underlying racketeering activities but, rather, simply assigns a base offense level of nineteen. In considering the applicability of a role-in-the-offense enhancement to this base offense level, a court must look to the defendant's role in an enterprise as a whole. It would defy common sense to take a different tack with respect to subsection (a)(2) and examine individual predicates instead of the enterprise as a whole.

Should more be needed — and we doubt that it is — the approach advanced by the appellant would lead to incongruous

- 13 -

results.  If, say, the application of a role-in-the-offense enhancement depended upon assessing individual predicate acts in a vacuum, a defendant who served as the kingpin of even the most sprawling criminal enterprise could nonetheless escape a role-in-the-offense enhancement simply because each of the predicate acts underlying his conviction involved fewer than five participants and was not otherwise extensive.  See Ivezaj, 568 F.3d at 99; Damico, 99 F.3d at 1437.  We agree with the Second Circuit that "it makes little sense to allow a defendant who acts in a leadership capacity in a wide-ranging criminal enterprise to have his offense level adjusted on the basis of his participation in discrete racketeering acts."  Ivezaj, 568 F.3d at 99.

To prattle on about this issue would serve no useful purpose.  We hold that when a defendant is convicted of racketeering conspiracy under 18 U.S.C. § 1962(d), the imposition of a role-in-the-offense enhancement under USSG §3B1.1(b) depends upon his role in the racketeering enterprise as a whole, not upon his role in the discrete predicate acts that underpin the charged conspiracy.

This does not end our odyssey.  The appellant argues, in the alternative, that even if we accept the approach endorsed by Damico and its progeny — as we do — the district court's conclusion that he served as a manager or supervisor of the overarching RICO

enterprise lacked record support.[2]  It is to this argument that we now turn.

This claim of error is waived.  After all, the appellant never raised it in his opening brief on appeal — and it is settled beyond hope of contradiction that arguments not made in an appellant's opening brief are deemed abandoned.  See, e.g., United States v. Fraser, 388 F.3d 371, 377 (1st Cir. 2004) (per curiam); Sandstrom v. ChemLawn Corp., 904 F.2d 83, 86 (1st Cir. 1990).  And even though the appellant challenged the sufficiency of the district court's factual findings regarding his role in the overall enterprise in his reply brief, that was too little and too late.  By then, the claim of error had been waived.

Waiver aside, the claim of error lacks force.  It hinges on the supportability of the district court's factual findings, but the appellant must pass over a higher-than-usual hurdle in order to set aside those findings.  We explain briefly.

To begin, the appellant does not question that the racketeering enterprise (the clique), taken as a whole, involved five or more participants.  Instead, he trains his fire on the

---

[2] As part of this argument, the appellant alleges that "the district court never made a finding regarding" the appellant's role in the enterprise as a whole.  This allegation is belied by the record, as the court unequivocally stated that it was "easily satisfied" that the appellant was "a de facto manager" of the enterprise, given that he was "the only homeboy in the clique who was on the streets" during the pertinent time frame.

- 15 -

district court's factual finding that he was a manager or supervisor within the hierarchy of the clique. But there is a rub: he did not object below to the district court's factual finding that he occupied such a managerial or supervisory role.[3] We therefore review his claim exclusively for plain error. See United States v. Flete-Garcia, 925 F.3d 17, 37 (1st Cir.), cert. denied, 140 S. Ct. 388 (2019); United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

Review for plain error is not appellant-friendly. It "entails four showings: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Duarte, 246 F.3d at 60. The proponent of plain error must carry the burden of establishing each of these four elements. See Miranda-Díaz, 942 F.3d at 39.

In this instance, the district court relied upon the facts disclosed in an unchallenged paragraph of the PSI Report.[4]

---

[3] To be sure, the appellant objected to construing the relevant guideline in a way that made his role vis-à-vis the racketeering enterprise a critical determinant in the enhancement calculus. This objection, though, raised a claim of legal error, separate and apart from the claim of factual error that he now advances.

[4] Although the appellant did object to certain portions of the PSI Report, the district court did not rely on those disputed

It is well-established that facts limned in uncontested portions of a PSI Report are "ordinarily 'considered reliable evidence for sentencing purposes.'" United States v. Carbajal-Váldez, 874 F.3d 778, 783 (1st Cir. 2017) (quoting United States v. Morillo, 8 F.3d 864, 872 (1st Cir. 1993)), cert. denied, 138 S. Ct. 2586 (2018). So it is here.

The facts gleaned from this undisputed paragraph in the PSI Report adequately support the district court's description of the appellant's role in the clique. Taking those facts as true, the court had a solid foundation for finding that the appellant served as a "de facto manager" of the clique after the incarceration of the clique's First Word in April of 2014 and acted in that capacity through the commission of the racketeering acts described in the count of conviction.

Although the appellant was not in full command of the clique — Leoner, even though imprisoned, remained the First Word — it does not follow that the appellant was ineligible for a role-in-the-offense enhancement under section 3B1.1(b). See United States v. Savoie, 985 F.2d 612, 616 (1st Cir. 1993). We have made pellucid that "[a] defendant need not be the highest ranking member of a criminal troupe in order to be a manager or supervisor" of that troupe. Id. Such an interpretation is entirely consistent

---

paragraphs in finding that the appellant acted in a managerial or supervisory capacity vis-à-vis the clique.

with the text of the relevant guideline: section 3B1.1 underscores that the managerial role enhancement, "as opposed to other upward role-in-the-offense adjustments, appl[ies] to defendants who were managers or supervisors, but <u>not</u> organizers or leaders." <u>Id.</u> (emphasis in original); <u>see</u> USSG §3B1.1(b).

Given the factual support made manifest in the record, we discern no clear or obvious error in the challenged ruling. Consequently, we hold that the district court's factual finding that the appellant played a managerial or supervisory role in the RICO conspiracy was not plainly erroneous. The role-in-the-offense enhancement was, therefore, appropriate.

### III. CONCLUSION

We need go no further. For the reasons elucidated above, the sentence is

**<u>Affirmed.</u>**